UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GENERAL ELECTRIC COMPANY f/k/a )
GE WARRANTY MANAGEMENT, INC. and )
GE SERVICE MANAGEMENT, INC., )
)
    Plaintiff, ) No. 05 C 5763
)
v. ) Judge John W. Darrah
)
GOOD GUYS, INC.; GOOD GUYS CALIFORNIA, )
INC.; and COMPUSA, INC., )
)
    Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiff, General Electric Company, filed suit against Defendants, alleging fraud, negligent misrepresentation, violations of the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA") and Illinois Consumer Fraud and Deceptive Practices Act ("ICFDPA"), and breach of contract. Presently before the Court is Defendants' Motion to Dismiss.

### BACKGROUND

A reading of the Amended Complaint supports the following summary of the alleged operative conduct of the parties.

Good Guys California, Inc.("GGC") is a subsidiary of Good Guys, Inc. ("GG"). GGC is the alleged successor, agent and/or alter ego of GG. GG is now a dissolved corporation as a result of a stock purchase by a wholly owned subsidiary of CompUSA, Gladiator Acquisition Corporation. CompUSA is the successor, agent and/or alter ego of GG and has assumed the liability of GG by acting in its stead and as a direct participant in its operations.

Prior to 2001, GG contracted with Virginia Surety Company, Inc., a wholly owned subsidiary of AON Corporation ("AON"), to underwrite and sell at wholesale, for purposes of resale to consumers at retail prices, extended warranty contracts for the products sold by GG. The extended warranty program provided by AON was operated by GG as a "premium program" under which GG consumers could return or exchange products for any reason. GG sought to replace the extended service program provided by AON with a less expensive program.

During the first quarter of 2001, General Electric Company ("GE") entered into negotiations with GG to begin underwriting and supplying the extended warranty contracts sold by GG to consumers. While conducting these negotiations, GE entered into concurrent negotiations with AON to assume responsibility for servicing the contracts previously sold by GG and serviced by AON. The existing service contracts were referred by the parties as the "back book" of business.

As part of the negotiations between GG and GE, GE explained to GG the differences between the extended service program provided by AON and GE's proposed extended service program. GE informed GG that at the offered price, its extended service program would provide more limited coverage for consumers than the AON program as administered by GG. GG chose to contract with GE for the more limited coverage program. GG knowingly chose to offer a program that cost GG less than the AON program.

During the negotiations with GE, GG intentionally concealed critical information that GE would have used when deciding whether to underwrite GG's extended service program. These concealments included information about the current costs of running the program and the actual loss experienced under the program. For example, Ron Unkefer, the Chairman and CEO of GG, directed a GG employee to provide only selected information to GE rather than complete and

accurate information. Unkefer also directed other GG employees not to alert AON to erroneous double discounts on previously sold service contracts or the problems GG had with customer exchanges under the extended service contracts. GG concealed this information with the intent that GE would rely on the limited and misleading information provided and, as a result, would significantly underestimate the true cost of running the GG extended service program. Based on the erroneous, limited, and misleading information provided by GG, and based on GG's omissions, GE entered into a Retail Dealer Agreement ("RDA") with GG and set pricing terms for the service contracts. While GGC was not a signatory of the RDA, it was integrally involved in implementing the RDA, operated under the RDA's terms, and benefitted from the RDA's operation. The pricing terms of the RDA became effective June 1, 2001. Because the pricing terms within the RDA were so artificially low, GE began to suffer losses immediately.

Under the terms of the RDA, GE assumed the risk of the "back book" of business from AON. The RDA also provided that GE would provide going-forward extended warranty repair service, or replacement service if the product was deemed non-repairable, for certain products sold by GG and covered by a repair service contract and replacement service for certain products sold by GG and covered by a replacement service contract. In return, GG agreed to solicit its customers for the purchase of GE extended service contracts and provide GE with the appropriate service fee for each contract sold.

The RDA provided an agreed method for handling replacement of products covered by the extended service program. For example, if a product covered by a repair service contract was deemed non-repairable or not cost effective to repair, or if a product was covered by a replacement service contract, GE agreed to authorize replacement for such products. To replace such products

under the program, GE required GG to obtain "authorization numbers" for the replacements. GG obtained the necessary authorization numbers by providing GE the reason a replacement was needed. GG could then obtain reimbursement for ninety percent of the retail price of the replaced product by submitting claims to GE that included documentation of the GE authorization numbers and of the retail product prices and tax. If GG did not obtain an authorization, GE was not responsible to reimburse GG for the cost of the replacement. GG also agreed to retain all replaced products at a central location for at least ninety days to allow GE to perform random audits of the replaced products to verify the products' defectiveness. After the ninety-day period, the defective products became GG's property.

As to repairs conducted by GG under the RDA, GE agreed to reimburse GG for repairs covered by the service contract according to a fixed schedule. In addition, GE agreed to reimburse GG for the parts required for repairs at GG's cost plus ten percent. With respect to repairs conducted by GG, GG agreed not to charge GE for labor or parts for any service work covered by another company's warranty or service agreement. GG also agreed not to charge GE for service work in excess of the scheduled rate unless approved by GE. GE had the right to conduct periodic audits of GG's service repair work and records pertaining to work performed on behalf of GE. GG agreed to send GE verifying documentation within ninety days for each service call.

The RDA also incorporated, by reference, the GE Service-Policy and Procedure Manual, which GG agreed to follow. GE and GG also agreed that GG would notify GE in writing of any new products it wanted to include in the extended warranty program.

GG did not alert its employees to the differences between the new extended service program provided by GE and the AON's extended service program. GG also continued using the same

training materials and manuals to train its employees on the GE extended service program that were used to train its employees on the AON program.

Based on the actual loss experienced administering the "back book" of business and GE's extended service program for nearly a year, GE determined that it needed new pricing for the GG account. In May 2002, as allowed under the RDA, GE provided new pricing for the entire extended service program. GG refused to implement the new pricing.

Pursuant to the terms of the RDA, and because GG refused to accept the new pricing, GE invoked its right to audit the GG account in the third quarter of 2002. The 2002 GE audit consisted of: (1) examination of replaced products at a warehouse location, (2) store visits to review claims and interview GG employees, and (3) a meeting at GG headquarters to review claim processes. The GE audit team met with GG representatives at GG's headquarters. GE audited GG's practices of obtaining authorization for replacements by reporting to GE that repair parts were no longer available or by reporting that products were "lemons" and inherently defective. The audit results demonstrated that GG breached the RDA by: (1) representing to consumers that coverage of the service contracts included services that were not in fact included, (2) submitting erroneous information to GE to obtain authorization to replace products when no repairs or only minor repairs were necessary, (3) failing to retain replaced products for the required ninety days, (4) charging erroneous prices for cell phone service contracts, (5) submitting erroneous service contract dates to GE, (6) failing to submit service contracts to GE for coverage, and (7) exaggerating the benefits of the GE service program to the consumer.

In October 2002, GE reviewed the audit results with GG. GG did not deny the accuracy of the audit results. As a result of the audit, GE withheld payment of certain claims for reimbursement because of the improper business practices revealed in the audit and because of GG's unwillingness to implement the new pricing. GE also determined that changes in the service program process and pricing structure were needed to keep the program viable. In November or December 2002, GE and GG met several times to resolve the pricing issue and the breaches of the RDA revealed by the audit. During these discussions, GG failed to disclose to GE that GG had entered into discussions with third parties over the possible purchase of GG. On February 21, 2003, GE and GG amended the RDA via a Letter Agreement.

Under the Letter Agreement, GG agreed to implement the new pricing for the service contract program; and it reiterated GG's obligation to allow GE to audit its replacement process by retaining replaced products for ninety days. GE was permitted to audit GG "on a random sample and to the extent that . . . replaced product[s] cannot be located, then GE shall be entitled to reduce the aggregate amounts to be reimbursed to Good Guys." GG also agreed that no service contracts would be sold on replaced products that had been refurbished and for which GE had already reimbursed GG.

The reimbursement provisions of the RDA were also modified by the Letter Agreement. GE would reimburse GG for eighty percent of the retail price of replacement products and that GE would reimburse GG for cell phones at actual cost. GE would also reimburse GG for television preventative maintenance or cleaning performed for service contracts sold on or after March 3, 2003. However, GG would assume the expense of performing television preventative maintenance or cleaning for all service contracts sold from July 1, 2001 through March 2, 2003. GG and GE also

agreed to negotiate "in good faith" to create a new agreement by October 31, 2003. The newly contemplated agreement was to incorporate the terms of the RDA and its amendments and would extend the operation of the RDA by three years. As part of the Letter Agreement, GE paid $1,333,000 to GG for claim reimbursements that had been withheld as a result of the previous audit and GG's refusal to implement the new program pricing.

In October 2003, CompUSA announced its plans to purchase GG. In November 2003, GE and GG entered into Amendment No. 2 to the RDA. Amendment No. 2 provided that GG only needed to hold inventory of replaced products from ninety days to thirty days so that GE could conduct random audits. GE and GG also reaffirmed their agreement to work in good faith to enter into a new agreement, on or before February 1, 2004, that would extend the operation of the RDA for three years.

CompUSA finalized the purchase of GG on or about December 19, 2003. From the date of the merger, CompUSA's directors, officers and employees exercised complete control over GG and GG's policies and finances. CompUSA was aware of the RDA, the Letter Agreement, and Amendment No. 2.

Throughout the change in GG ownership, GE continued to honor the RDA, the Letter Agreement, and all amendments. In January 2004, CompUSA, GG, and GE met to discuss the extended service program and a three-year renewal agreement. GG and CompUSA refused to enter into the anticipated three-year extension of the program.

In the first quarter of 2004, GE again audited the GG/CompUSA account. During the 2004 audit, GE conducted a physical audit of a GG distribution center, a GG service center, and GG's headquarters. A physical audit of replaced products covered under repair service contracts was also

conducted. The 2004 audit results showed that CompUSA and GG were not fulfilling their promises and continued to violate the RDA and amendments. Violations included: (1) servicing and repairing products prior to obtaining approval from GE, (2) requesting replacement parts when GG failed to repair products correctly the first time, (3) overbilling GE for claims on replacement contracts, (4) erroneously representing that parts were not available or providing other erroneous reasons to obtain authorization from GE to provide replacements on repair contracts, (6) continuing to honor requests for product replacements not covered by the replacement contracts, (7) misrepresenting the coverage provided under the service contracts, (8) failing to retain products for inspection by GE for a minimum of thirty days, and (9) replacing a high number of non-defective products at GE's expense. As a result of the audit, GE set-off approximately $13 million worth of reimbursements.

From August 2004 to January 2005, GE repeatedly provided the 2004 audit results to GG and CompUSA and met with their representatives to discuss a resolution and remedy for the breaches of the RDA.

Despite GE's continued honor of the RDA and its amendments with GG and CompUSA, from approximately March 2005 to date, CompUSA has not remitted approximately $7 million for the extended service contracts it bought from GE and resold to consumers. On October 8, 2005, CompUSA and GG announced the closure of the GG stores. As a result of the closure of the GG stores, consumers have used CompUSA's consumer service department to obtain coverage for their claims under the extended service program.

## ANALYSIS

In reviewing a motion to dismiss, the court considers all facts alleged in the complaint and any reasonable inferences drawn therefrom in the light most favorable to the plaintiff. *See Marshall-Mosby v. Corporate Receivables, Inc.*, 205 F.3d 323, 326 (7th Cir. 2000). A plaintiff is not required to plead the facts or the elements of a claim, with the exceptions found in Federal Rule of Civil Procedure 9. *See Swierkiewicz v. Sorema*, 534 U.S. 506, 511 (2002); *Kolupa v. Roselle Park Dist.*, 438 F.3d 713, 713 (7th Cir. 2006) (*Walker*). Dismissal is warranted only if "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). The "suit should not be dismissed if it is possible to hypothesize facts, consistent with the complaint, that would make out a claim." *Graehling v. Vill. of Lombard, Ill.*, 58 F.3d 295, 297 (7th Cir. 1995). A filing under the Federal Rules of Civil Procedure need not contain all the facts that will be necessary to prevail. It should be "short and plain," and it suffices if it notifies the defendant of the principal events. *Hoskins v. Poelstra*, 320 F.3d 761, 764 (7th Cir. 2003).

### *Fraud Claim*

Defendants argue that GE's fraud claim should be dismissed because GE failed to plead fraud with the required particularity.

Federal Rule of Civil Procedure 9(b) requires a plaintiff to plead the circumstances constituting fraud with particularity. "This means the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

In addition to the above-alleged facts, GE alleges that GG and CompUSA intentionally made a series of false statements of material fact to GE that they knew or believed were false during the negotiations and performance of the RDA and its amendments. These false statements included providing GE with inaccurate profit and loss information for the "back book" of the AON extended service program contracts as well as representations that GG did not have current profit and loss information available. During the negotiations of the Letter Agreement, Amendment No. 2 and the subsequent proposed amendments to the RDA, GG and CompUSA made false statements representing that GG and CompUSA would enter into good faith negotiations with GE and would undertake a three-year agreement with GE. During the operation of the RDA and its amendments, GG and CompUSA made false statements of descriptions of product defects or repairs to GE. GE also lists several other examples of false and misleading statements made by GG and/or CompUSA during the negotiations of the RDA, its amendments, and subsequent proposed amendments.

GE has sufficiently pled its fraud claim with the requisite particularity.

*Negligent Misrepresentation Claim*

Defendants argue that GE's negligent misrepresentation claim should be dismissed because GE's allegations are so vague and ambiguous that the Defendants cannot reasonably be required to frame a responsive pleading. Defendants contend that they cannot answer the allegations because the allegations fail to identify the person making the negligent misrepresentations, to whom the negligent misrepresentations were made, the content of the negligent misrepresentations, and the date and time of such negligent misrepresentations. However, GE need not plead specifics or the elements of his claim. *See Kolupa*, 438 F.3d at 713 ("It is enough to name the plaintiff and the

defendant, state the nature of the grievance, and give a few tidbits (such as the date) that will let the defendant investigate."). GE has sufficiently pled its negligent misrepresentation claim.

### ICFDPA and IUDTPA Claims

Defendants argue that GE's ICFDPA and IUDTPA claims should be dismissed because none of the alleged wrongful acts occurred in Illinois.

Illinois consumer fraud acts do not apply to fraudulent transactions which take place outside of Illinois. *See Avery v. State Farm Mutual Automobile Ins. Co.*, 216 Ill.2d 100, 185 (2005) (*Avery*) (ICFDPA); *Super Wash, Inc. v. Sterling*, 2006 WL 533362 (N.D. Ill. Mar. 2, 2006) (IUDTPA); *In re Sears Roebuck & Co. Tools Marketing & Sales Practices Litig.*, 2005 WL 3077606 (N.D. Ill. Nov. 14, 2005) (IUDTPA). A fraudulent transaction takes place within Illinois "if the circumstances relating to the transaction occur primarily and substantially within [the] state." *Avery*, 216 Ill. 2d at 186.

GE does not dispute that GG only conducted business in four states, not including Illinois,[1] and that none of the alleged fraud and deceptive business practices occurred in Illinois. Instead, GE argues that Illinois consumers purchased service contracts from the Defendants; and several of the contracts are still active. However, this argument is based on an affidavit provided by GE in its response brief. The Amended Complaint does not include these allegations, and GE cannot amend

---

[1] The Court takes judicial notice that GG did not have any retail businesses in Illinois based on GG Form 10K filed with the Securities and Exchange Commission on May 8, 2003. *See Anderson v. Simon*, 217 F.3d 472, 474-75 (7th Cir. 2000) (court may take judicial notice of matters of public record in deciding motion to dismiss.)

its complaint via its response to the motion to dismiss. *See Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996); *Car Carriers v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984). Instead, the Amended Complaint alleges that, "Upon information and belief, Illinois consumers were directly and/or indirectly harmed by [Defendants'] violations of this Act." GE has not alleged any circumstances relating to the transactions that occurred primarily and substantially within Illinois.

GE also alleges that, as an Illinois corporation, it is a consumer under the ICFDPA and has suffered damages from Defendants' fraud and deception. A "consumer" under the ICFDPA is "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household." 815 ILCS 505/1(e). In the instant case, GE contracted with GG for GG to sell GE service contracts. GE is not a "consumer" in its transactions with GG.

A competitor may also file suit under the ICFDPA as a representative of the consumer interest if the competitor can demonstrate that the complained of conduct implicates consumer protection concerns. *See Speakers of Sport, Inc. v. Proserv, Inc.*, 178 F.3d 862, 868 (7th Cir. 1999). GE has not pled that it is a competitor filing suit as a representative of the consumer interest and has not pled any conduct that implicates consumer protection concerns for an Illinois consumer. *See Avery*, 216 Ill. 2d at 186.

Based on the above, GE has failed to state a claim under the ICFDPA and IUDTPA.

*Breach of Contract Claims*

Defendants argue that GE's breach of contract claims should be dismissed, to the extent that they relate to alleged acts committed on or before November 30, 2002, because GE had released all

such claims in the first amendment to the RDA. GE does not dispute that a release was included in the first amendment to the RDA (Letter Agreement). GE argues that the allegations as they relate to the alleged acts on or before November 30, 2002, should not be dismissed because the Letter Agreement was fraudulently induced and, alternatively, assuming the amendment was properly effected, the Letter Agreement was of no effect and was obviated by GG's own breaches of the agreement.

Drawing all reasonable inferences in GE's favor, GE sufficiently pleads fraudulent inducement and/or vitiation by GG. Defendants present several arguments as to why GE's arguments fail. However, these arguments go to the merits of the allegations and are not addressed at this stage of the litigation.

Defendants also argue that the breach of contract claims against CompUSA and GGC should be dismissed because they were not parties to the contracts with GE. However, GE has pled that CompUSA and GGC directly participated in some aspects of the GG/GE relationship and/or that they were third-party beneficiaries under the contracts.

*Miscellaneous Arguments*

Defendants argue that CompUSA and GGC should be dismissed because GE only pled conclusory allegations as to GE's alter ego and agent theories of liability. GE need not plead specifics or the elements of their claims. *See Kolupa*, 438 F.3d at 713. Defendants also present arguments addressing the merits of GE's alter ego and agency claims. These arguments are not addressed at this stage of the litigation.

Lastly, GGC argues that it is not subject to personal jurisdiction in Illinois. However, GE alleges that GGC was directly and/or indirectly involved in the terms of the RDA as GG's alter ego, agent, or third-party beneficiary. A corporation submits to the jurisdiction of Illinois by the "performance of any contract or promise substantially connected with [the] state." 735 ILCS 5/2-209(a)(7). GE has sufficiently pled personal jurisdiction over GGC.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is granted in part and denied in part. Counts III and IV (respectively, the ICFDPA and IUDTPA claims) are dismissed without prejudice; Defendants' Motion to Dismiss as to the remaining counts is denied. Plaintiff is given leave to file an amended complaint, if any, within 14 days of this Order.

Dated: October 6, 2006

JOHN W. DARRAH
United States District Court Judge